AO 91 (Rev. 11/11)  Criminal Complaint

**F I L E D**
CLERK, U.S. DISTRICT COURT

5/29/2024

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ VV _____ DEPUTY

# UNITED STATES DISTRICT COURT
for the

Central District of California

| United States of America | ) | |
|---|---|---|
| v. | ) | |
| Mark Perez, Ivan Quintos, and Salvador Lopez | ) | Case No.    2:24-MJ-03151-DUTY |
| | ) | |
| | ) | |
| | ) | |
| *Defendant(s)* | ) | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ___August 11, 2023, to May 16, 2024,___ in the county of ___Los Angeles and Orange___ in the

___Central___ District of ___California___, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 922(o) | Possession of Machinegun |
| 18 U.S.C. 922(q)(2) | Possession of Firearm Within School Zone |

This criminal complaint is based on these facts:

See attached affidavit

☑ Continued on the attached sheet.

_Ani Ghaltakhchyan_
*Complainant's signature*

SA Ani Ghaltakhchyan
*Printed name and title*

Sworn to before me and signed in my presence.

*Judge's signature*

Date:     ___05/28/2024___

City and state:     ___LOS ANGELES, CA___
*Printed name and title*

*AUSA:* William Larsen (x0298)

**<u>AFFIDAVIT</u>**

I, Ani Ghaltakhchyan, being duly sworn, declare and state as follows:

## I. <u>PURPOSE OF AFFIDAVIT</u>

1.    This affidavit is made in support of a criminal complaint and arrest warrants against defendants MARK PEREZ ("PEREZ"), also known as ("aka") "Malphas," aka "Malphas89," and IVAN QUINTOS ("QUINTOS"), aka "settrip," aka "settripda_gunner," for violations of 18 U.S.C. § 922(o)(1): Possession of a Machinegun, and against SALVADOR LOPEZ ("LOPEZ"), aka "Chava," aka "chavarana0.14," for a violation of 18 U.S.C. § 922(q)(2): Possession of Firearm Within School Zone.

2.    This affidavit is also made in support of an application for warrants to search:

    a.    The person of PEREZ, as described more fully in Attachment A-1;

    b.    The person of QUINTOS, as described more fully in Attachment A-2;

    c.    The person of LOPEZ, as described more fully in Attachment A-3;

    d.    5739 Cedarglen Drive, Azusa, California 91702 ("SUBJECT PREMISES 1"), as described more fully in Attachment A-4;

    e.    12501 Pellissier Road, Whittier, California 90601 ("SUBJECT PREMISES 2"), as described more fully in Attachment A-5;

f.    1640 257th Street, Apartment 2, Harbor City, California 90710 ("SUBJECT PREMISES 3"), as described more fully in Attachment A-6; and

g.    A white Dodge Challenger bearing Nevada license plate 359W97 and registered to PEREZ (the "SUBJECT VEHICLE"), as described more fully in Attachment A-7.

3.    The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 18 U.S.C. § 371 (Conspiracy to Deal in Firearms Without a License); 18 U.S.C. § 933(a)(3) (Conspiracy to Traffic Firearms); 18 U.S.C. § 922(a)(1) (Dealing in Firearms Without a License); 18 U.S.C. § 933(a)(1) (Firearms Trafficking); 18 U.S.C. § 922(g)(9) (Possession of a Firearm by a Prohibited Person); 18 U.S.C. § 922(k) (Possession of Firearm with Removed or Altered Serial Number); 18 U.S.C. § 922(o) (Possession of a Machinegun); 18 U.S.C. § 924(h) (Transferring Firearm with Prohibited Purpose); 18 U.S.C. § 922(q) (Possession of Firearm Within School Zone); 18 U.S.C. § 111(a) (Assault on a Person Assisting a Federal Officer); 18 U.S.C. § 924(c) (Use of a Firearm in Furtherance of a Crime of Violence); and 18 U.S.C. § 2114(a) (Robbery of Money of the United States) (collectively, the "SUBJECT OFFENSES"), as described more fully in Attachments B-1 and B-2.  Attachments A-1, A-2, A-3, A-4, A-5, A-6, A-7, B-1, B-2, and B-3[1] are incorporated herein by reference.

---

[1] For the Court's convenience of reference, the government proposes that Attachment B-1 would govern the searches of PEREZ, QUINTOS, and their associated property and vehicles as described
*(footnote cont'd on next page)*

4.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest warrants, and search warrants, and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF AFFIANT

5.    I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), and have been so employed since June of 2021. I am currently assigned to the Glendale Field Office of the Los Angeles Field Division of ATF, which conducts investigations into violations of federal firearms, explosives, and narcotics laws. My experience as an ATF SA includes, but is not limited to, conducting physical surveillance, executing search and arrest warrants, and participating in controlled drug/gun purchases using informants. I have experience investigating violations of federal statutes governing firearms and narcotics. I have also conducted surveillance of individuals trafficking firearms and illegal controlled substances, and persons possessing illegal firearms.

---

in Attachments A-1, A-2, A-4, and A-7.  The government proposes that Attachment B-2 would govern the search of LOPEZ and his residence, as described in Attachments A-3 and A-5.  Attachment B-3 would govern the search of the apartment associated with UM3 as described in Attachment A-6.

6.    As part of my training, I attended the Criminal Investigator and Special Agent Basic Training Academies for ATF at the Federal Law Enforcement Training Center in Glynco, Georgia for approximately 27 weeks. This training included instruction on federal and state firearms and narcotics laws and regulations.

7.    I graduated Magna Cum Laude with a Bachelor's degree in Criminal Justice and Law in Society from California State University, Los Angeles. During my education, I completed a two-year internship with the United States Marshals Service ("USMS") in Los Angeles, CA. During that two-year period, I spent six months at the USMS Fugitive Apprehension Task Force where I was trained to use databases such as the National Crime Information Center, to gather background information on the subjects of investigations.

8.    I also received Master of Science in Criminology with a concentration in Global Criminology from San Jose State University.

### III.  <u>SUMMARY OF PROBABLE CAUSE</u>

9.    From August 11, 2023, to May 16, 2024, across twelve audio- and video-recorded controlled transactions, PEREZ, QUINTOS, and LOPEZ collectively sold ATF Undercover Agents ("UCs") and an ATF Confidential Informant ("CI")[2] approximately 50 firearms and associated ammunition.

---

[2]    The CI has worked for ATF since 2011. He/she has felony convictions for RICO in 2010 and possession of a controlled substance in 1996 and 1997. ATF agents met the CI when he/she
*(footnote cont'd on next page)*

10.   PEREZ, QUINTOS, and LOPEZ conspired to sell a wide variety of firearms to the UCs.  For example, PEREZ and QUINTOS sold UCs a Glock "switch," which is a machinegun conversion device.  While at a controlled purchase on or about January 31, 2024, QUINTOS explained to UCs that a Glock switch can be used to "make the Glock automatic," and PEREZ explained that he did not himself use a Glock switch because it is a "federal charge."

11.   LOPEZ appears to have supplied at least a dozen of the guns that QUINTOS, in turn, sold to UCs.  LOPEZ also sold guns to an ATF CI directly and through intermediaries.  For example, on May 15, 2024, during a controlled purchase, LOPEZ sold the CI a Sig Sauer model 1911, .45-caliber pistol.  LOPEZ met the CI at a location that LOPEZ suggested in Gardena, California, situated across the street and within 330 feet from a middle school with visible school signage.

12.   Based on the information available to me, I submit that probable cause exists to believe that PEREZ and QUINTOS violated 18 U.S.C. § 922(o)(1) (Possession of a Machinegun) and that LOPEZ violated 18 U.S.C. § 922(q)(2) (Possession of Firearm Within School Zone).  I also submit that there is probable cause to believe that the search of PEREZ's, QUINTOS's, and LOPEZ's persons, SUBJECT PREMISES 1, which is QUINTOS's residence, SUBJECT PREMISES 2, which is LOPEZ's residence, SUBJECT PREMISES 3, which is where one of LOPEZ's associates (identified below as "UM3") entered after robbing the CI on May 16, 2024, and the

_____

sustained the RICO conviction for which he/she received 23 months' imprisonment. He/she works as a CI for compensation, and ATF has paid him/her approximately $397,400 over 12 years.

SUBJECT VEHICLE, which is PEREZ's car that he has driven to controlled transactions, will yield evidence of the SUBJECT OFFENSES as described more fully in Attachments B-1, B-2, and B-3.

### IV. STATEMENT OF PROBABLE CAUSE

**A.    Agents meet QUINTOS via his "settrip" Instagram account, and QUINTOS sells UCs firearms in audio- and video-recorded controlled transactions.**

13.    Based on my review of communications between the UCs and QUINTOS, PEREZ, and LOPEZ, reports prepared by myself and other ATF agents, my review of audio- and video-recordings of the controlled transactions, and my own knowledge of this investigation, I know the following:

a.    In June 2023, Baldwin Park Police Department gang unit officers told ATF agents about an Instagram account, "settripda_gunner" ("settrip"), that offered psilocybin mushrooms for sale. An ATF Undercover Agent ("UC-1") requested to follow settrip, who accepted UC-1's follow request.[3]

b.    Via Instagram, QUINTOS offered to sell UC-1 psilocybin hallucinogenic mushrooms, and on or about July 6, 2023, in an audio- and video-recorded transaction, UC-1 and UC-2 bought two packages of suspected psilocybin mushrooms from

---

[3] QUINTOS has admitted that he is "settrip." After QUINTOS asked UC-1 for a phone number, QUINTOS used phone number 213-349-1681 to send a text message to UC-1 that said, "what up gee it's settrip." QUINTOS also used the "settrip" account to set up many of the below buys where he personally appeared and sold guns to agents. And after the government obtained a warrant for the settrip account, I found messages where settrip identifies himself as QUINTOS. For example, settrip messaged other accounts listing his name as "Ivan Quintos" and his email as "ivanquintos@hotmail.com." The settrip account's subscriber information also includes QUINTOS's actual date of birth.

QUINTOS for $200.  During the controlled transaction, UC-1 asked QUINTOS if he deals in anything else, and QUINTOS asked UCs what they were looking for.  UC-2 said he/she heard QUINTOS post "straps" (i.e., firearms) on Instagram.  QUINTOS asked UC-2 if the UC needed a "strap," and explained that he was waiting to receive some firearms including MACs and Glocks (two types of firearms).  QUINTOS is clearly visible in the video recording.

       c.    On or about July 20, 2024, QUINTOS contacted UC-1 over Instagram with a picture of a handgun and said that the "homie sent me this for 1250."  In response, UC-1 said that the UC would buy it, and the pair agreed to meet.  QUINTOS used his 213-349-1681 phone number and texted UC-1 the address of the meet location for the buy: 5738 Cedarglen Drive in Azusa, California.  According to an open source law enforcement database, QUINTOS's home address is across the street at 5739 Cedarglen Drive, Azusa, California (i.e., SUBJECT PREMISES 1).

       d.    On or about August 11, 2023, in an audio- and video-recorded transaction, QUINTOS sold UCs a Smith & Wesson, model SD9VE, 9mm pistol with an obliterated serial number and approximately 90 grams of suspected psilocybin mushrooms for $1,800.  Though QUINTOS provided the "5738 Cedarglen Drive" address, when the UCs arrived, QUINTOS and two males were standing in the driveway of SUBJECT LOCATION 1 when UCs arrived, and QUINTOS walked from SUBJECT LOCATION 1 with the firearm to meet with UCs in their car.  QUINTOS is clearly visible in the video recording.

e.    UC-1 and QUINTOS stayed in contact.  On or about
August 24, 2023, via Instagram message, QUINTOS sent UC-1
pictures of a pistol and a rifle.  QUINTOS asked UC-1 to "lmk
gee," and UC-1 let QUINTOS know that UC-1 was interested in
buying the guns.  QUINTOS and UC-1 discussed prices, settling on
$1,300 each for the firearms, and UC-1 again told QUINTOS that
UC-1 sends all the guns overseas, where they pay "3 bands" for
each, which, based on my training and experiences, means $3,000.

f.    On or about September 15, 2023, in an audio- and
video-recorded transaction, again located at SUBJECT PREMISES 1,
QUINTOS sold UCs a German Sports Guns GSG-5, .22-caliber rifle
bearing serial number A313050, and a Smith & Wesson M&P 9, 9mm
pistol, bearing serial number HTY3661, for $2,600.  QUINTOS is
clearly visible in the video recording.

g.    During the September 15, 2023, controlled
transaction, QUINTOS asked UC-1 if he could take a picture of
the 22 caliber rifle "because after this, it's gone forever."
QUINTOS later posted that picture to his Instagram story with
the caption "missing you already":



h.    QUINTOS and UC-1 coordinated a fourth meeting in September 2023.  On or about September 17, 2023, via text message, QUINTOS reinitiated contact to ask if UCs were back in town yet because he had "Got some new things that are coming by," including a 300 "Blackout" model and a 1911 pistol. QUINTOS agreed to sell UCs firearms, and again proposed to meet at SUBJECT PREMISES 1.

i.    On or about September 26, 2023, in an audio- and video-recorded transaction, QUINTOS met the UCs at SUBJECT PREMISES 1, and sold them a "300 Blackout" model, privately manufactured firearm, bearing no manufacturer's mark or serial number (commonly referred to as a "ghost gun"), in exchange for $1,600.  QUINTOS is clearly visible in the video recording.

j.    QUINTOS and UC-1 coordinated a fifth meeting later that month.  On or about September 27, 2023, via text message, QUINTOS reinitiated contact with UCs to ask when they would be back in town.  QUINTOS text messaged a picture and a video of two pistols on September 28, 2023.  After initially

agreeing to sell the UCs the two pistols for $1,400 each, QUINTOS later offered to also sell an AR-style rifle for $1,500.

k.    On or about October 2, 2023, in an audio- and video-recorded transaction, QUINTOS met with the UCs at SUBJECT PREMISES 1 and sold the UCs two firearms, namely, a Glock 17GEN4, 9mm pistol, bearing serial number AAFP717, and a privately manufactured AR-style rifle, bearing no manufacturer's mark or serial number, in exchange for $2,900.  QUINTOS informed the UCs that he had sold the third gun to another customer. QUINTOS is clearly visible in the video recording.

l.    QUINTOS offered additional guns to UC-1 in November 2023 and January 2024.  In particular, via text message, defendant QUINTOS offered the UCs the following two "AR-style" rifles for $2,500 each and an M&P pistol for $1,200:



m.    The government sought a warrant for QUINTOS's "settrip" Instagram account.  On February 5, 2024, the Honorable Brianna Mircheff, U.S. Magistrate Judge, in Case No. 2:24-mj-657, issued a warrant to search QUINTOS's Instagram account (the "February Instagram warrant").

n.    Via the February Instagram warrant, I searched QUINTOS's account and discovered that, on or about January 9, 2024, defendant LOPEZ messaged defendant QUINTOS the following picture, which appears to be an exact mirror image of the picture provided by QUINTOS to UC-1:



o.    On or about January 11, 2024, in an audio- and video-recorded transaction, QUINTOS -- accompanied by an unidentified male, as well as an approximately 8-year-old child later identified as QUINTOS's son -- met the UCs at the parking lot behind the Ralph's grocery store located on Western Avenue in Koreatown, Los Angeles.  QUINTOS told the UCs, "sometimes you just gotta bring your kid to business and shit."

p.    That same day, QUINTOS sold the UCs a Smith & Wesson M&P 9 Shield, 9mm pistol, bearing serial number JWM1924, in exchange for $1,200.  QUINTOS is clearly depicted in the video recording.  During the controlled purchase, QUINTOS stated that his "homie from fuckin' Whittier" (which I believe to be a reference to LOPEZ, whose home address – SUBJECT PREMISES 2 - is located at 12501 Pellissier Road, Whittier, California 90601)

was supposed to bring the AR-style rifles pictured above but did not show up.

**B.    January 17, 2024: PEREZ, QUINTOS, and LOPEZ sell UCs thirteen firearms.**

14.    Based on my review of communications between the UCs and QUINTOS, PEREZ, and LOPEZ, reports prepared by myself and other ATF agents, my review of audio- and video-recordings of the controlled transactions, and my own knowledge of this investigation, I know the following:

a.    Following the October 2023 transaction, on or about January 13, 2024, via text messages, QUINTOS reinitiated contact with UCs.  QUINTOS then sent pictures of ten guns to UC-1 and offered to sell the guns to UC-1.  The UCs agreed to buy all of them and made plans with QUINTOS to meet up on January 17, 2024, at a buy location in Los Angeles.

b.    Via the February Instagram warrant, I discovered that LOPEZ appears to have provided many of the guns that QUINTOS offered to UC-1.  On January 10, 2024, via Instagram, LOPEZ direct messaged pictures of the following guns to QUINTOS (left), which appear to match guns QUINTOS then offered to UC-1 (right):

LOPEZ's message to QUINTOS:    QUINTOS's message to UC-1:



c.    On or about January 17, 2024, QUINTOS, accompanied by multiple then-unknown individuals, arrived at a buy location in Los Angeles.  Agents and LAPD officers observed the SUBJECT VEHICLE arrive at the buy location and identified the driver as PEREZ, who was the registered owner of the SUBJECT VEHICLE per Department of Motor Vehicle ("DMV") records.[4] Agents and LAPD officers also observed a black Infiniti sedan, bearing California license plate 7WZT970, arrive at the buy location and identified the driver as LOPEZ, who was the registered owner of the black Infiniti at the time per DMV records.  Agents and LAPD officers observed a burgundy/red Cadillac Escalade bearing California license plate 5SWY061, arrive at the buy location and identified the driver as QUINTOS.[5]

d.    On or about January 17, 2024, QUINTOS, LOPEZ, PEREZ, and co-conspirators arrived at the parking lot of the buy location in three vehicles.  QUINTOS exited his vehicle and got into PEREZ's SUBJECT VEHICLE, and they drove into the buy location.  Throughout the controlled purchase, LOPEZ and one of the co-conspirators stayed outside the buy location.  LOPEZ was observed waiting outside the buy location next to the black Infiniti.

---

[4] PEREZ sustained a conviction for misdemeanor Battery Constituting Domestic Violence in violation of Nevada Revised Statutes § 200.485 on September 27, 2021.

[5] On January 16, 2024, via Instagram, LOPEZ messaged PEREZ instructing PEREZ to meet him at 12418 Pellissier Road, Whittier, CA 90601.  This address is roughly 180 feet away (across the street) from SUBJECT PREMISES 2.

e.    During the January 17, 2024, controlled transaction, PEREZ, QUINTOS, a co-conspirator, and UCs took all the guns out of the SUBJECT VEHICLE's trunk and into the lounge area of the buy location.  PEREZ and QUINTOS are clearly depicted in the video recording.  PEREZ took out two rifles and said, "both these are M1s."  UCs asked PEREZ where he got the guns, and QUINTOS explained that the "foos from Pomona just came up on some World War 2, like, veteran's place and they came up on a gang of World War 2 straps, like last week."

f.    Also during the January 17, 2024, controlled transaction, the UCs explained to PEREZ and QUINTOS that the UCs had a new customer in Taiwan and that all of the firearms are going overseas.  The UCs noted that they wanted to obtain handguns because they were easier to smuggle.  PEREZ spoke briefly to the co-conspirator and then offered to sell the co-conspirator's personal handgun to UCs.  UCs agreed to buy that gun and did so on the spot.  PEREZ then remembered that he had another .22 caliber handgun, which he obtained from a third unidentified male who stayed seated in the SUBJECT VEHICLE and sold to UCs.

g.    In total, during the January 17, 2024, audio- and video-recorded controlled transaction, UCs paid PEREZ and QUINTOS $13,900 for thirteen guns and associated ammunition, namely: a Springfield Armory M1A 7.62mm rifle, bearing serial number 186736; a Weatherby unknown model .270-caliber rifle, bearing serial number 346193; a Winchester Model 12 16-gauge shotgun, bearing serial number 871069; a Springfield Armory M1

.30-caliber rifle, bearing serial number 228262; a Franchi Affinity 3 Sporting 12-gauge shotgun, bearing serial number BL80708Z19; two privately manufactured rifles bearing no manufacturer marks or serial numbers; a Smith & Wesson Model 19 .357-caliber revolver, bearing serial number ACB1044; a Ruger SR1911 .45-caliber pistol, bearing serial number 672-56286; a Sig Sauer P250 9mm pistol, bearing serial number EAK142265; a Sig Sauer P229 .40-caliber pistol, bearing serial number AE35869; a Taurus model TX22 .22 caliber pistol, bearing serial number 1PT602628; and a Glock Model 23 .40-caliber pistol, bearing serial number RVV403.

      h.   During the January 17, 2024 controlled transaction, PEREZ and QUINTOS also sold the following ammunition: (i) approximately nine rounds of 9mm ammunition of unknown manufacturer; (ii) approximately 12 rounds of .40-caliber Winchester-Western ammunition; (iii) approximately 15 rounds of .22-caliber ammunition, unknown manufacturer; (iv) approximately 26 rounds of .40-caliber ammunition, unknown manufacturer; (v) approximately 20 rounds of .357-caliber Barnes Bullets ammunition; and (vi) approximately 49 rounds of .45-caliber Aguila 45 ammunition.

      i.   Following the January 17, 2024, controlled transaction, via Instagram (as obtained through the February Instagram warrant), LOPEZ messaged QUINTOS, "next time I gotta go in make sure we get our bread cause I ain't doing a play for 5 bills rather not worry about it."

j.   About a week later, on or about January 24, 2024, QUINTOS followed up with the UCs about the January 17 controlled transaction.  Specifically, via text message, QUINTOS asked the UCs whether "everything went coo with Taiwan" and, "did they end liking what we had."

**C.    January 31, 2024: PEREZ and QUINTOS sell UCs thirteen more firearms, including a machinegun conversion device.**

15.  Based on my review of communications between the UCs and QUINTOS, PEREZ, and LOPEZ, reports prepared by myself and other ATF agents, my review of audio- and video-recordings of the controlled transactions, and my own knowledge of this investigation, I know the following:

a.   On or about January 29, 2024, via text message, QUINTOS sent the following photographs of the firearms showing the Instagram username "Malphas" at the top of the image:



   b.   The following day, QUINTOS offered thirteen
firearms to the UCs for sale for $17,400.  The UCs negotiated,
and QUINTOS agreed to a total sale price to $17,000.

   c.   On or about January 31, 2024, PEREZ drove the
SUBJECT VEHICLE inside the buy location in Los Angeles, with
QUINTOS in the passenger seat.

   d.   On or about January 31, 2024, in an audio- and
video-recorded controlled transaction, PEREZ and QUINTOS sold
thirteen guns to the UCs for a total of $15,800, namely, an RWC
Group KR-103 Kalashnikov .762 rifle, bearing serial number
K3R0009804; a Ruger 10/22 .22-caliber rifle, bearing serial
number 825-93934; a Sgt of Arms SGT-15, unknown caliber rifle,
bearing serial number 0158; a Sgt of Arms SGT-15, unknown-
caliber rifle, bearing serial number 0165; a Patriot Ordinance
P-15, multiple caliber rifle, bearing serial number 03E-2108942;
a Glock 19X, 9mm pistol, bearing serial number BYMZ342; a Glock
19TGEN5, 9mm pistol, bearing serial number BWYN896; a Glock
Model 26 9mm pistol, bearing serial number AFCG645; a Glock
19GEN5 9mm pistol, bearing serial number BPDR701; an HS Produkt
HS-9 9mm pistol, bearing serial number 42742; a Beretta PX4
Storm pistol, 9x19 caliber, bearing serial number PX7874F; a
Glock 20GEN5 10mm pistol, bearing serial number CABS213; a Glock
"switch" machinegun conversion device; and the following rounds
of ammunition: (i) approximately 4 rounds of 9mm ammunition,
unknown manufacturer; and (ii) approximately 45 rounds of 10mm
ammunitions, unknown manufacturer.  QUINTOS and PEREZ are
clearly visible in the video recordings.

18

e.    During the January 31, 2024, controlled transaction, QUINTOS asked UCs if they knew what the Glock switch does.  QUINTOS explained to the UCs that it makes a Glock handgun, which is normally semiautomatic, automatic.  PEREZ said that he did not personally carry a Glock switch because it's a bigger charge, and QUINTOS added that it's a "federal charge." PEREZ then stated that the switch "alone" was "like 15 years." UCs asked PEREZ, "Glock makes this?", and PEREZ responded, "I'm not even sure who makes them, cuz I know they're illegal.".

f.    Toward the end of the January 31, 2024, controlled transaction, PEREZ provided the UCs with his phone number.  Later that day, PEREZ texted the UCs with the name, "Malphas."  ("Malphas" was the display name at the top of the Instagram screenshots of firearms that QUINTOS had provided UCs prior to the sale.)

**D.    Across two more controlled transactions in February and March 2024, PEREZ sells UCs sixteen more firearms.**

16.    Based on my review of communications between the UCs and QUINTOS, PEREZ, and LOPEZ, reports prepared by myself and other ATF agents, my review of audio- and video-recordings of the controlled transactions, and my own knowledge of this investigation, I know the following:

a.    On or about February 8, 2024, via text message, PEREZ reached out to UCs and offered "2 more things" (i.e., firearms) for sale.  PEREZ initially declined to provide photographs of the firearms, "just to be a lil safer yfm" [i.e., "you feel me"?].

b.    Approximately a week later, after PEREZ provided a price list for seven total firearms that PEREZ offered for sale, UCs asked for pictures because the "people we send them to be asking." PEREZ provided photographs to UCs, including the following:

   

c.    On or about February 28, 2024, in an audio- and video-recorded controlled transaction, PEREZ and a co-conspirator sold the UCs seven firearms and associated ammunition for a total of $9,200, namely: a Norinco SKS, .762-caliber rifle, bearing serial number 1705580; FSAAP LLC FR-16, unknown caliber rifle, bearing serial number A03206; a Palmetto State Armory PA-15, multi caliber rifle, bearing serial number, SCB504282; a Mossberg Model 590, 12-gauge shotgun, bearing serial number V1701130; a Mossberg Model 590, 12-gauge shotgun, bearing serial number V1589136; a Glock 29GEN4, 10mm pistol, bearing serial number BTHW888; and Llama MAX I, .45-caliber pistol, bearing serial number 07-04-09963-96.

d.    During the February 28, 2024, controlled transaction, PEREZ stated to the UCs, "remember that one time I brought the M1s? It was like hella guns. Like, all those guns were stolen," and defendant PEREZ stated that half the guns were stolen from a garage.

e.    PEREZ also stated that his source for many of the other firearms had been arrested, but despite that source's arrest, PEREZ would still be able to obtain guns.

f.    After the February 28, 2024, controlled transaction, via text message, PEREZ reached out to UCs asking if he left his "locks" in UCs' "whip."  UCs responded that they would check.  After the UCs were silent for nine days, via text message, on March 11, 2024, PEREZ asked, "yo yall need more?"  After UCs responded that, yes, they did need more firearms, between on or about March 15, 2024, and on or about March 23, 2024, PEREZ offered the UCs firearms, including the following firearms:

  

g.    On or about March 26, 2024, PEREZ and an unidentified woman met UCs at a buy location in the Los Angeles area.  After unloading the guns from the trunk of the SUBJECT VEHICLE, PEREZ explained that one rifle had a "custom 20 inch barrel on it so it can go through vests."  After UCs noticed that the rifle's serial number was obliterated, PEREZ said, "yeah, the homie did that."  UCs asked where PEREZ's co-

conspirator from the February 28 controlled purchase was, and
PEREZ indicated that the gun with the obliterated serial number
belonged to that co-conspirator, who decided not to come to
California because he was on probation.

      h.   On or about March 26, 2024, PEREZ and an un-
identified co-conspirator sold the UCs nine firearms and
associated ammunition for a total of $13,200, namely, a Fostech
MFG LLC Origin-12 12-gauge shotgun, bearing serial number
0001861; Palmetto State Armory PA-15 .556-caliber rifle, with an
obliterated serial number; a CZ USA Scorpion EVO 3 S1 9mm rifle,
bearing serial number C647805; a Glock 19GEN4 9mm pistol,
bearing serial number WWV305; a Glock Model 22 .40-caliber
pistol, bearing serial number BNGS715; a Para USA P14.4 .40-
caliber pistol, bearing serial number RG1071; a Glock 23GEN4
.40-caliber pistol, bearing serial number BBTK648; a Glock
19CGEN4 9mm pistol, bearing serial number AHNU297; and a Canik55
TP-9SA 9mm pistol, bearing serial number 18AP11267.

    **E.**    **Across two more controlled transactions in May 2024,**
            **LOPEZ sells the CI two more firearms -- including in a**
            **transaction across from a school.**

    17.   Based on my review of communications between the UCs,
the CI, and QUINTOS, PEREZ, and LOPEZ, reports prepared by
myself and other ATF agents, my review of audio- and video-
recordings of the controlled transactions, and my own knowledge
of this investigation, I know the following:

      a.   As explained above, through my review of
QUINTOS's Instagram account, I am aware that LOPEZ was one of
QUINTOS's firearm sources and co-conspirators.  I attempted to

set up a controlled transaction directly with LOPEZ.  However,
LOPEZ's then-most-recent account, "chavarana0.14," had been
deleted.  Based on my knowledge that LOPEZ has previously
created new accounts, I searched Instagram for LOPEZ's first
name and previous account handles and discovered LOPEZ's
"Salvador0.144" Instagram account.  Based on the profile
pictures, the similarity of the account's profile name to
LOPEZ's previous Instagram accounts,[6] and a comparison of the
account's photos with LOPEZ's DMV photograph, I believe that
LOPEZ operates the "Salvador0.144" Instagram account.

      b.   LOPEZ had posted the following photographs to his
Instagram story as of on or about May 10, 2024:

  

---

      [6] LOPEZ's other Instagram accounts were named "Chava.023t"
and "Chavarana0.14."  The current account is named
"Salvador0.144."  "Chava" is a Spanish nickname for "Salvador."

c.   On or about May 10, 2024, via Instagram, an ATF CI reached out to LOPEZ to attempt to set up a controlled purchase.   The same day, LOPEZ posted several photographs of firearms to his Instagram, captioning the first two photographs with, "Got you a deal today only":

  

d.   That same day, via Instagram, the CI replied to LOPEZ's story and asked for a price.   LOPEZ replied, "1.5 bro." LOPEZ and the CI continued communicating via Instagram and agreed to meet in Gardena, California.   LOPEZ then messaged the CI and asked him to meet LOPEZ's "homie" in Anaheim, California. ATF agents met with the CI, searched him/her for contraband, and, not finding any, provided the CI with $3,000 and audio/video recording and transmitting devices.

e.    On or about May 10, 2024, during an audio- and video-recorded controlled transaction, the CI bought a rifle from LOPEZ's associates,[7] namely, a CMMG Inc. MOD4 SA multi-caliber rifle, bearing serial number SA34637, for $1,500.

f.    After the May 10, 2024, controlled transaction, via Instagram, LOPEZ messaged the CI and asked, "You liked it bro?"  LOPEZ apologized for not being able to personally attend the controlled transaction.

g.    Later that day, LOPEZ messaged the CI with additional pictures of firearms for sale:

  

---

[7] The CI's conversations with LOPEZ's associates referenced "him" and the "homie," referring to LOPEZ.  In setting up the deal, LOPEZ referred to one of his associates as "some rapper," and, through online research, law enforcement officers identified the associate as an individual who appears via publicly-available social media to be an aspiring rapper.

h.    LOPEZ and the CI continued talking, and on or about May 13, 2024, via Instagram, LOPEZ messaged the CI with additional pictures of firearms for sale:

 

i.    On or about May 14, 2024, via Instagram, LOPEZ agreed to sell three firearms to the CI for a total of $4,500. After initially suggesting another location, LOPEZ messaged the CI via Instagram with the following address: 16610 South Menlo Avenue, Gardena, California 90247 (the "School Zone Location").[8]

j.    The School Zone Location is less than 350 feet from Environmental Charter Middle School – Gardena.  In fact, the School Zone Location is directly across the street from the

---

[8] LOPEZ has used or proposed the School Zone Location for firearms transactions in the past.  Through the February Instagram Warrant, I am aware that, before the January 11, 2024, controlled transaction, LOPEZ messaged QUINTOS to suggest the School Zone Location as a buy location.  QUINTOS then messaged UCs the same 16610 S. Menlo School Zone Location, before QUINTOS and UCs ultimately agreed to meet in the Ralph's parking lot in Koreatown.

middle school, and, at its closest point, is significantly closer than 350 feet.  The following signs are clearly visible to the naked eye from the School Zone Location, and read "ECMS – now enrolling grades 6, 7, & 8" along with the same message in Spanish.  The signs are visible in front of what appear to be several sets of school lunch tables:




        k.    On or about May 15, 2024, an ATF agent and I met with the CI at a predetermined location.  ATF Task Force officers and LAPD officers set up surveillance.  An ATF agent and I met with the CI, provided him/her with $6,500 and with audio/video recording and transmitting devices.

        l.    That same day, defendant LOPEZ met the CI and sold him/her one firearm, namely a Sig Sauer 1911, .45 Auto caliber pistol, bearing serial number 54B064128, for $1,500.

LOPEZ and the CI met in the CI's car on the public street in front of the School Zone Location and the firearm was contained in an unlocked plastic gun case.  LOPEZ is clearly captured on video during the controlled transaction, and at one point looks directly toward the area with the middle school's signage.

m.   LOPEZ was not able to provide two additional firearms that he had previously offered to the CI during the May 15, 2024, controlled transaction.  LOPEZ said that he would try to set up the transaction for the remaining guns the following day.

18.  At approximately 7:23 p.m., ATF agents and Baldwin Park Police Department officers surveilled the CI back to the predetermined location.  At the predetermined location, another ATF agent and I retrieved the audio and video recording device, one pistol, and a few magazines from the CI vehicle. I retrieved the remaining $5,000 in U.S. currency.

19.  A few minutes later, an LAPD officer observed LOPEZ enter the apartment complex located at 16619 South Menlo Street, Gardena, California.

**F.    LOPEZ's associates rob an ATF Confidential Informant at gunpoint.**

20.  Based on my review of communications between the UCs and QUINTOS, PEREZ, and LOPEZ, reports prepared by myself and other ATF agents, my review of audio- and video-recordings of the controlled transactions, and my own knowledge of this investigation, I know the following:

a.    Via Instagram, the CI and LOPEZ set up another buy for May 16, 2024.  Specifically, on or about May 16, 2024, LOPEZ sent an Instagram message offering to sell two "ARs" and an "XD"[9] to the CI for $4,300.  The CI agreed to buy the firearms.  LOPEZ instructed the CI to meet at 1516 W 261st street, Harbor City, California 90710, between 7:30 p.m. and 8:00 p.m. on May 16, 2024.

b.    At approximately 7:50 p.m. on May 16, 2024, the CI messaged LOPEZ via Instagram and told LOPEZ that he/she is at the location that LOPEZ provided.  LOPEZ responded, "wyd don't see you," followed by a short video of where the CI should meet him.

c.    The CI followed the instructions in LOPEZ's video and arrived at the new meeting location.  When he/she got there, an unidentified Hispanic man ("UM1") pointed to a parking spot, where the CI then parked.  UM1 and the CI greeted each other.

d.    UM1 asked if the CI had the "feria."[10]  The CI followed UM1 to his vehicle trunk.  UM1 tried to open the trunk but it was locked, so UM1 moved back to the driver's side door.

e.    The CI turned around to face two unknown individuals pointing guns at the CI.  One individual was masked ("UM2"); the other was an unmasked, Black male ("UM3").[11]  UM1, UM2, and UM3 pointed their weapons at the CI and told the CI,

---

[9] Based on training, experience, and conversations with law enforcement officers, "XD" refers to a model of a pistol.

[10] Based on training and experience, "feria" is slang for money.

[11] UM1, UM2, and UM3 are likely minors based on current information.

"shut up, don't say nothing" followed by "give me the fucking money, don't reach." UM1 told the CI to lift his/her shirt up, and one of the individuals said, "grab the money, grab the money." On the recording, I also heard one of the individuals saying "piru, piru," throughout the robbery.[12]

        f.   UM1 pointed at the wall and told the CI to go there, or he will "bust" (i.e., shoot his gun at the CI). The CI told the robbers to take whatever they wanted. On the recording, as UM3 enters the CI's car, UM1 is heard calling someone, "Willy." UM3 drove off in the CI's car, and UM1 and UM2 leave the location in a car later identified as a stolen black Kia bearing California license plate 7LLK354.

    21.  Ultimately, the assailants took the CI's car (later recovered a few blocks away), cell phone, and the $5,000 in government funds that I had given to the CI to conduct the controlled buy.

    22.  ATF agents were monitoring the CI's audio recording device in real time and heard the CI's conversation with the assailants, and which indicated sounds of robbery in progress. LAPD officers ultimately found the CI alone with the assailants having left the scene.

    23.  Following LOPEZ's associates' robbery of the CI, I confirmed that LOPEZ appears to have deleted the "Salvador0.144" Instagram account through which LOPEZ set up the May 10, 2024, purchase, the May 15, 2024, purchase, and the May 16, 2024,

---

[12] Based on training and experience, conversations with other law enforcement officers, "PIRU" is a subset of the Bloods gang.

attempted controlled purchase that ended in a robbery.  However,
Instagram maintains account records following deletion.  On May
22, 2024, the Honorable Jean P. Rosenbluth, U.S. Magistrate
Judge, in Case No. 2:24-mj-2986, issued a warrant to search
LOPEZ's "Salvador0.144" Instagram account and other accounts
believed to be associated with the robbery.

> **G.    Law enforcement identifies SUBJECT RESIDENCE 3 after
> one robber runs into an apartment at that address
> following the robbery.**

24.  Based on my review of communications between the UCs
and QUINTOS, PEREZ, and LOPEZ, reports prepared by myself and
other ATF agents, my review of audio- and video-recordings of
the controlled transactions, and my own knowledge of this
investigation, I know the following:

a.   On May 16, 2024, after the robbery, an LAPD
Officer found the CI's vehicle parked rear of 1606 257th Street
in an alleyway, a few blocks away from where the incident
occurred.

b.   The following day, ATF Special Agents went to the
alleyway where the CI's vehicle was recovered to look for
his/her stolen phone and wallet.  Law enforcement officers asked
neighbors for security footage, and with the consent of one of
the nearby businesses, ATF Special Agents reviewed video footage
from May 16, 2024.  The footage showed UM3 run in front of the
business and disappear from the camera view between two garages
by a tan color brick wall.

c.   ATF Special Agents suspected that UM3 ran through
the apartment complex, so they followed a walkway near one of

the garages with an unlocked door.  That investigation led to
the 1640 257th Street, Harbor City, CA 90710 apartment complex
(whose Unit #2 is SUBJECT PREMISES 3).

      d.   Inside the apartment building where SUBJECT
PREMISES 3 is located, an ATF Special Agent observed a few
credit cards in front of Unit #3.  Special Agents talked to the
owner of the apartment, who informed the Special Agents that he
found the cards on the ground the day before (referring to May
16, 2024) and placed them on a bin in front of his door.  The CI
confirmed that the cards found in front of Unit #3 were
his/hers.

      e.   On May 20, 2024, an ATF Special Agent and LAPD
officer searched the area near 1640 257th for more cameras to
locate UM3. An ATF Special Agent and LAPD Officer went to the
alleyway where the CI's vehicle was recovered for additional
surveillance footage. The Special Agent and LAPD officer were
able to get surveillance footage from a motel that has a camera
pointing into the alleyway and observed UM3 running down the
alleyway and making a right hand turn by a tan color brick wall
mid-way through the alley, further confirming that UM3 ran into
the apartment building containing SUBJECT PREMISES 3.  The
Special Agent and LAPD officer also observed doorbell camera
footage from across the street pointing at 1640 257th Street
that showed UM3 enter Unit #2 (i.e., SUBJECT PREMISES 3) at
approximately 7:57 p.m. on May 16, 2024.  The Special Agent and
LAPD officer then walked to the apartment complex and discovered
that the unit UM3 entered was marked Unit "#2".

**H.    ATF experts examine the firearms.**

25.    Based on my review of an April 11, 2024, report prepared by ATF Firearms Enforcement Officer Jeffrey Bodell, I know that on April 8, 2024, Officer Bodell examined and test-fired the Glock "switch" machinegun conversion device sold by PEREZ and QUINTOS during the January 31, 2024, controlled transaction.  Officer Bodell concluded that the Glock "switch" is a combination of parts designed and Intended for use in converting a weapon into a machinegun, therefore, it is a "machinegun" as defined in 18 U.S.C. § 921(a)(24) and 26 U.S.C. § 5845(b).

26.    Based on my review of May 7, 2024, and May 17, 2024, draft reports prepared by ATF Special Agent Tiffany Lamphere, I know that SA Lamphere, who is an ATF Firearms and Ammunition Interstate Nexus Expert, examined the firearms sold by PEREZ, QUINTOS, and LOPEZ, and determined that the majority of the firearms[13] were manufactured outside of the State of Nevada (with respect to firearms sold during the February 28, 2024, controlled transaction) or outside of the State of California (with respect to firearms sold during all of the other controlled transactions).  Because the firearms were sold in California and Nevada, respectively, I believe that they traveled in and affected interstate commerce.

---

[13] SA Lamphere was unable to determine the origin of four privately-made firearms (also known as "ghost guns") because they had no serial numbers.  SA Lamphere was also unable to determine the origin of three other firearms.  SA Lamphere determined that the remaining firearms travelled in interstate commerce.

I.    **Investigation into the Premises and Vehicles to Be Searched**

27.    Based on my review of communications between the UCs and QUINTOS, PEREZ, and LOPEZ, reports prepared by myself and other ATF agents, my review of audio- and video-recordings of the controlled transactions, and my own knowledge of this investigation, I know the following.

1.    QUINTOS's home (SUBJECT PREMISES 1)

28.    I first became aware of SUBJECT PREMISES 1 on or about August 11, 2023, when QUINTOS used SUBJECT PREMISES 1 as a meet location to sell UCs a firearm and psilocybin hallucinogenic mushrooms.  QUINTOS also sold UCs firearms at SUBJECT PREMISES 1 on September 15, 2023, September 26, 2023, and October 2, 2023, as described above.

29.    On May 28, 2024, I reviewed an open source law enforcement database which revealed that SUBJECT PREMISES 1 is QUINTOS's current place of residence.

30.    On May 25, 2024, law enforcement officers surveilled SUBJECT PREMISES 1 and observed the red/burgundy Escalade that QUINTOS had previously driven to controlled transactions listed above parked in front of SUBJECT PREMISES 1.

2.    LOPEZ's home (SUBJECT PREMISES 2)

31.    On May 16, 2024, and May 28, 2024, I reviewed law enforcement databases which revealed that SUBJECT PREMISES 2 is LOPEZ's current place of residence.

32.    On May 23, 2024, law enforcement officers surveilled SUBJECT PREMISES 2 and observed LOPEZ arrive at SUBJECT

PREMISES 2 in a white Toyota Corolla bearing California License Plate #8PSC998 and park in the area of SUBJECT PREMISES 2.  Law enforcement officers observed LOPEZ enter SUBJECT PREMISES 2.

      3.   <u>Apartment associated with UM3 (SUBJECT PREMISES 3)</u>

33.  As described above, I first became aware of SUBJECT PREMISES 3 when video footage showed UM3 run inside the premises after robbing an ATF CI.  ATF Special Agents later found the CI's stolen credit cards inside the building where SUBJECT PREMISES 3 is located.

34.  On May 28, 2024, I reviewed an open source law enforcement database which revealed that SUBJECT PREMISES 3 is associated with M.C., and I understand that M.C. is the mother of two minor females who are associated with UM3.

      4.   <u>PEREZ's car (the SUBJECT VEHICLE)</u>

35.  On or about January 17, 2024, I queried Department of Motor Vehicle records for the SUBJECT VEHICLE and discovered that it was registered to PEREZ.  I compared PEREZ's DMV photograph to the video footage of the January 17, 2024, controlled transaction and determined that it matched.

36.  Agents have set up an additional controlled transaction for May 29, 2024, in which PEREZ has agreed to come to Los Angeles to sell firearms.  Because PEREZ has previously driven the SUBJECT VEHICLE to firearms transactions, I anticipate that he may do so again and thus that the SUBJECT VEHICLE will be located in the Central District of California on May 29, 2024.

37.  I am also aware that PEREZ has continued to use the
SUBJECT VEHICLE since the controlled transactions described
above.  On February 23, 2024, in Case No. 2:24-mj-205-BNW, in
the District of Nevada, Magistrate Judge Brenda Weksler issued a
tracking warrant for the SUBJECT VEHICLE.  Magistrate Judge
Weksler extended the tracking warrant on April 5, 2024, to
expire May 20, 2024.  Throughout the period in which the
tracking warrant was authorized, include up through May 20,
2024, I observed that PEREZ has continued to use the SUBJECT
VEHICLE.

**J.   There is Probable Cause to Believe That Evidence of
the SUBJECT OFFENSES Will Be Found on the SUBJECTS'
Persons, Premises, and Vehicles**

38.  From my training, personal experience conducting
firearms investigations, and the collective experiences related
to me by other law enforcement officers who conduct who also
conduct firearms investigations, I am aware of the following:

a.   Persons who illegally possess, purchase, or sell
firearms, including machineguns, often store firearms,
prohibited items, and evidence of possession and sale on their
person, in their residence, and in vehicles that they control.

b.   Persons who illegally possess, purchase, or sell
firearms generally maintain records of their firearm
transactions as items of value and usually keep them in their
residence, or in places that are readily accessible, and under
their physical control, such in their digital devices.  It has
been my experience that prohibited individuals who own firearms
illegally will keep the contact information of the individual

who is supplying firearms to prohibited individuals or other individuals involved in criminal activities for future sales, purchases, or referrals.  Such information is also kept on digital devices on their person and in backpacks or purses in their vicinity.

        c.   Many people also keep mementos of their firearms, including digital photographs or recordings of themselves possessing or using firearms on their digital devices.  These photographs and recordings are often shared via social media, text messages, and over text messaging applications.  These may include recordings or photographs that may reveal both that a person has possessed a particular firearm or ammunition (e.g., photographs of them holding a particular firearm) and also that person's knowledge of the firearm's characteristics and functionalities (e.g., videos of them firing a fully automatic firearm).  Digital devices containing such evidence are often kept on the person.

        d.   Those who illegally possess firearms often sell their firearms and purchase firearms.  Correspondence between persons buying and selling firearms often occurs over phone calls, e-mail, text message, and social media message to and from smartphones, laptops, or other digital devices.  This includes sending photos of the firearm between the seller and the buyer, as well as negotiation of price.  In my experience, individuals who engage in street sales of firearms frequently use phone calls, e-mail, and text messages to communicate with each other regarding firearms that the sell or offer for sale.

In addition, it is common for individuals engaging in the
unlawful sale or possession of firearms to have photographs of
firearms they or other individuals working with them possess on
their cellular phones and other digital devices as they
frequently send these photos to each other to boast of their
firearms possession and/or to facilitate sales or transfers of
firearms.  These communications may include information or
references that tend to establish a person's knowledge of a
firearm's characteristics and functionalities (e.g., text or
social-media messages describing whether a firearm is semi-
automatic or equipped with a device that renders it capable of
fully automatic fire).  Digital devices containing such evidence
are often kept on the person.

        e.   Individuals engaged in the illegal purchase or
sale of firearms and other contraband often use multiple digital
devices to conceal their identities when engaging in firearms
transactions and to make detection and identification by law
enforcement more difficult.  Individuals engaged in such illegal
firearms transactions often carry one or more digital devices
with them so that they are able to stay in frequent
communication with potential suppliers or customers.

    39.  Based on all the above facts, I submit that there is
probable cause to believe that evidence of the SUBJECT OFFENSES
will be found on PEREZ's, LOPEZ's, and QUINTOS's persons,
including in digital devices thereon.  For example, text
messages, social-media messages, and/or photographs on any
digital devices on PEREZ's, LOPEZ's, and QUINTOS's persons may

tend to show that PEREZ, LOPEZ, and QUINTOS conspired together to traffic firearms and to engage in the business of dealing firearms without a license.  Messages, call records, and photographs may also demonstrate LOPEZ's involvement in the robbery of an ATF CI.

### V.  <u>TRAINING AND EXPERIENCE ON DIGITAL DEVICES</u>[14]

40.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.  Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

---

[14] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

b.    Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

41.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.  Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.  Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

42.  The search warrant requests authorization to use the biometric unlock features of any digital devices found on the persons of PEREZ, QUINTOS, and LOPEZ, based on the following, which I know from my training, experience, and review of publicly available materials:

a.  Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally

41

displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device. To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second. To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

c.   Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and that is found on the person of PEREZ, QUINTOS, or LOPEZ, as described further in Attachments A-1, A-2, and A-3: (1) depress PEREZ's, LOPEZ's, or QUINTOS's thumb and/or fingers on the device(s); and (2) hold the device(s) in front of PEREZ's, LOPEZ's, and QUINTOS's face with their eyes open to activate the facial-, iris-, and/or retina-recognition feature.

43.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VI. CONCLUSION

44.  For all of the reasons described above, there is probable cause to believe that PEREZ, QUINTOS, and LOPEZ have committed the SUBJECT OFFENSES.  There is also probable cause to believe that the items to be seized described in Attachments B-1 and B-2 will be found in a search of the persons of PEREZ, QUINTOS, and LOPEZ, as more fully described in Attachments A-1, A-2, and A-3, the SUBJECT PREMISES, as more fully described in Attachments A-4, A-5, and A-6, and the SUBJECT VEHICLE, as more fully described in Attachment A-7.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this __29__ day of May,
2024.

_____
HONORABLE MARGO A. ROCCONI
UNITED STATES MAGISTRATE JUDGE